IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER MAY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-4055 |
| Commissioner of Social Security | : | |

**<u>MEMORANDUM AND ORDER</u>**

ELIZABETH T. HEY, U.S.M.J.                                        April 26, 2023

Christopher May ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) to review the Commissioner's final decision denying her application for disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence.

## I.  <u>PROCEDURAL HISTORY</u>

Plaintiff applied for DIB on January 24, 2019, alleging disability beginning on January 11, 2018, due to neuroma of the left foot, residual from left knee surgery, a shifted right kneecap, high blood pressure, depression, spastic colon, Type 2 diabetes, nystagmus, ocular albinism, strained groin, and poor vision.  Tr. at 80, 231-32, 254, 258.[1] The applications were denied initially and on reconsideration.  Id. at 81-96, 98-115.  At Plaintiff's request, id. at 133-34, the ALJ held a telephonic administrative hearing on

---

[1]To be entitled to DIB, Plaintiff must establish that he became disabled on or before his date last insured ("DLI").  20 C.F.R. § 404.131(b).  The Certified Earnings Record indicates and the ALJ found that Plaintiff was insured through September 2023. Tr. at 14, 233.

October 15, 2020.  Id. at 37-79.  On November 9, 2020, the ALJ issued an unfavorable

decision, finding that Plaintiff was not disabled.  Id. at 12-27.  The Appeals Council

denied Plaintiff's request for review on July 12, 2021, id. at 1-6, making the ALJ's

November 9, 2020 decision the final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on September 10, 2021.  Doc. 1.

The matter is now fully briefed and ripe for review.  Docs. 6-9.[2]

## II.   **LEGAL STANDARDS**

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.      Whether the claimant is currently engaged in
> substantially gainful activity ("SGA");
>
> 2.      If not, whether the claimant has a "severe impairment"
> that significantly limits his physical or mental ability to
> perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the
> impairment meets or equals the criteria of an impairment
> listed in the "listing of impairments" ("Listings"), 20 C.F.R.
> pt. 404, subpt. P, app. 1, which results in a presumption of
> disability;
>
> 4.      If the impairment does not meet or equal the criteria
> for a listed impairment, whether, despite the severe

---

[2]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c).  See Standing Order – In Re: Direct Assignment of Social Security Appeals to
Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 3.

> impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and
>
> 5.      If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§ 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable

of performing other jobs in the local and national economies, in light of his age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88,

92 (3d Cir. 2007).

This court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion," and

must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v.

Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, __ U.S. __,

139 S. Ct. 1148, 1154 (2019) (substantial evidence "means only – 'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion'")

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary

review of legal issues.  Schaudeck, 181 F.3d at 431.

III.   **DISCUSSION**

Plaintiff was born on August 9, 1973, and thus was forty-four years of age at the

time of his alleged disability onset date (January 11, 2018), and forty-seven at the time of

the ALJ's decision under review (November 9, 2020).  Tr. at 231, 254.  He is five feet,

seven inches tall, and weighs approximately 305 pounds.  Id. at 258.[3]  Plaintiff completed

four years of college.  Id. at 259.  He lives in a house with family, including his mother

and his spouse.  Id. at 276, 307.  He has past relevant work as an adjunct professor, high

school special education teacher, crisis intervention specialist, and program director for a

non-profit shelter.  Id. at 45, 57-58, 284.[4]

A.    **ALJ's Findings and Plaintiff's Claims**

In the November 9, 2020 decision, the ALJ found at step one that Plaintiff has not

engaged in SGA since January 11, 2018, his alleged onset date.  Tr. at 14.  At step two,

the ALJ found that Plaintiff has the following severe impairments:

> degenerative disc disease ["DDD"] status post lumbar fusion
> surgery on July 7, 2020; osteoarthritis of the right knee with
> acute medial meniscus injury status post arthroscopy in
> January 2020; tear of the lateral meniscus, derangement and
> patellofemoral syndrome of the left knee status post surgery;
> morbid obesity with BMI scores in the 40s; nonischemic
> cardiomyopathy with no shortness of breath or chest pain;
> Morton's neuroma of the second and third intermetatarsal
> space of the left foot status post excision of both neuromas in

---

[3]At his administrative hearing, Plaintiff testified that his weight ranged "anywhere from 300 to 320 pounds."  Tr. at 47.  He weighed 290 pounds during an office visit on September 9, 2019.  Id. at 1559.

[4]The vocational expert ("VE") characterized Plaintiff's crisis intervention work as "crisis counselor," and explained that a crisis counselor is a clinical therapist.  Tr. at 58, 67.  The VE initially testified that although Plaintiff did not have a clinical therapist license, it should be considered past relevant work because "[h]e was doing the job."  Id. at 70.  After clarification regarding the number of hours Plaintiff performed as a crisis specialist, the VE testified "that the crisis position is not full-time work and should not be considered."  Id. at 74.  Nevertheless, the ALJ included "clinical therapist" among Plaintiff's past relevant work.  Id. at 26.

January 2018 with recurrence; mild peripheral neuropathy of
the left foot and bursitis/scar tissue of the left foot.

Id. at 15.  At step three, the ALJ found that Plaintiff does not have an impairment or

combination of impairments that meets or equals the Listings.  Id. at 17.  The ALJ then

found that Plaintiff retains the RFC to perform light work, with the following limitations:

> [Plaintiff] could frequently – one to two thirds of the time –
> lift up to 10 pounds and could occasionally – up to one third
> of the time – lift 10 to 20 pounds.  [He] could sit for eight
> hours, stand for three hours and walk for two hours during an
> eight-hour workday.  [He] is medically required to use a cane.
> [He] would be able to carry small objects in the other hand.
> [He] would be able to frequently perform manipulative
> activities with the bilateral upper extremities but could only
> occasionally use the bilateral lower extremities to operate foot
> controls.  [He] could only occasionally balance, stoop[],
> crouch and climb stairs but should never climb ladders, kneel
> or crawl.  [He] is affected visually, but [he] would be able to
> avoid ordinary hazards in the workplace such as boxes on the
> floor.  [He] would not be able to read very small print but
> would be able to read ordinary newsprint or book print and
> could view a computer screen.  [He] is able to determine
> difference in shape and color in small objects.  [He] could
> frequently be exposed to . . . environmental conditions other
> than occasional exposure to unprotected heights, moving
> mechanical parts, operation of a motor vehicle or extreme
> cold.

Id. at 19.  Based on the testimony of the VE, the ALJ found that Plaintiff is capable of

performing his past relevant work as a teacher of the learning disabled, a clinical

therapist, and a residence supervisor.  Id. at 26.  As a result, the ALJ concluded that

Plaintiff is not disabled.  Id. at 27.

Plaintiff argues that the ALJ's opinion is not supported by substantial evidence

because the ALJ (1) improperly evaluated the medical opinion evidence and (2) erred in

assessing Plaintiff's RFC.  Doc. 6 at 1-14; Doc. 8 at 1-4.  Plaintiff also argues that the

ALJ and the Appeals Council judges were not properly appointed and therefore had no

legal authority to adjudicate the case.  Doc. 6 at 14-15; Doc. 8 at 6-10.  Defendant

counters that the ALJ's opinion is supported by substantial evidence, and that the ALJ

and Appeals Council judges had authority to decide the case.  Doc. 7.

### B.   Summary of the Medical Record[5]

As noted, Plaintiff initially alleged disability due to neuroma of the left foot,

residual from left knee surgery, a shifted right kneecap, high blood pressure, depression,

spastic colon, Type 2 diabetes, strained groin, and eye conditions.  Tr. at 258.  In addition

to various diagnoses related to these complaints, the record also contains diagnoses of,

among other things, obesity, DDD status post lumbar fusion surgery, nonischemic

cardiomyopathy, irritable bowel syndrome ("IBS"), peripheral neuropathy and

bursitis/scar tissue of the left foot, and post-traumatic stress disorder ("PTSD").  See, e.g.,

id. at 634, 1346, 1361, 1612, 1679.

Beginning in April 2015, Plaintiff received recurrent diabetic foot examinations,

with complaints of acute foot pain and diagnosis of Morton's neuroma.  Tr. at 784-85.[6]

On January 12, 2018, Todd Rice, D.P.M., surgically excised an interdigital neuroma at

---

[5]Plaintiff's claims implicate both his physical and mental impairments.  Therefore, this summary will include both aspects of the medical record, presented in chronological order as much as practicable.

[6]A neuroma is "a tumor growing from a nerve or made up largely of nerve cells and nerve fibers."  Dorland's Illustrated Medical Dictionary, 32nd ed. 2012 ("DIMD") at 1266.  Morton's neuroma is a form of neuralgia, or nerve pain, characterized by chronic compression of a branch of the plantar nerve located in the foot.  Id. at 1262.

the distal second and third interspaces of Plaintiff's left foot, without complications.  Id. at 725-28.

On February 20, 2018, about five weeks after the neuroma surgery, Dr. Rice completed the Physician's Statement potion of a work-related disability claim.  Tr. at 765-66.  The doctor listed Plaintiff's primary diagnosis as excision of the neuromas, with pain and swelling, and his secondary conditions as left knee pain status post arthroscopic surgery.  Id. at 765.[7]  Dr. Rice opined that in an eight-hour workday, Plaintiff could stand and walk for less than one hour each, and could sit and drive for five to eight hours each. Id. at 766.  Plaintiff could perform simple grasping, pushing/pulling, and fine manipulation bilaterally, could never climb, could occasionally bend, squat and use foot controls, and could continuously reach above his shoulders, knees, crawl, and drive.  Id. Dr. Rice indicated that Plaintiff had no mental functional limitations.  Id.

On March 5, 2018, at a surgical follow-up with Dr. Rice, Plaintiff reported that he felt better overall since the neuroma excision, had some pain for which he did not take medication, and had difficulty walking and standing, especially for extended periods.  Tr. at 786.  He reported increased discomfort near the surgery site which he described as "pins and needles" which kept him up at night.  Id.  Upon examination, Dr. Rice noted a well-healed incision; minimal edema; normal pulses, sensation, deep tendon reflexes, and

---

[7]Just five days before Dr. Rice's assessment, Plaintiff underwent a left knee arthroscopy with lateral meniscectomy and a partial synovectomy.  Tr. at 953-54, 958. The procedure occurred after conservative treatment of a lateral meniscus tear of the left knee failed, id. at 953, and no post-surgical complications were reported.  Id. at 954.

manual muscle strength and tone of the lower extremities; and expected Plaintiff to maintain post-operative range of motion and alignment.  Id.  Dr. Rice added gabapentin[8] to address Plaintiff's residual nerve pain.  Id.

Plaintiff attended physical therapy in March 2018 with the goal of walking better. Tr. at 1130.  He attended six sessions through March 29, 2018, and then did not return for unknown reasons.  Id. at 1145.  Plaintiff reported that he "was progressing slowly" and was limited in his ability to perform weight bearing and dynamic activities due to left foot pain, which he attributed to a neuroma.  Id.

On April 13, 2018, an MRI scan of Plaintiff's left foot revealed small interdigital neuromas of the second and third interspaces, with abnormal soft tissue in both interspaces.  Tr. at 834-35.  On April 26, 2018, Fr. Rice injected Plaintiff's left foot with a nerve block.  Id. at 841.

From June through August 2018, Plaintiff underwent acupuncture treatment at Mainline Pain and Acupuncture Center.  Tr. at 623-28.  The physician's notes are largely illegible, but they indicate treatment for Morton's neuroma in successive visits.  Id.

On August 14, 2018, Plaintiff treated at Premier Orthopedic & Sports Medicine Associates ("Premier") for complaints of right knee pain.  Tr. 846-49.  Plaintiff's history included diabetes, osteoarthritis, and depression, and his medications included Janumet, Prozac, lisinopril, and Celebrex.  Id. at 846.[9]  The treatment provider noted some arthritic

---

[8]Gabapentin is used to treat nerve pain.  See http://www.drugs.com/gabapentin.html (last visited Apr. 5, 2023).

[9]Janumet is a diabetes medication containing metformin, which reduces glucose production in the liver and decreasing the absorption of glucose in the intestines, and

changes in Plaintiff's knee, with pain possibly caused by Plaintiff overcompensating for his left foot and knee pain.  Id. at 848.  X-rays revealed "[f]indings consistent with mild osteoarthritis."  Id. at 848.  The provider ordered a physical therapy evaluation, id. at 848, 849, and from August 2018 through April 2019, Plaintiff treated more than 50 times with ATI Physical Therapy ("ATI"), after which he no longer had right knee pain but continued to have left knee pain and limitation.  Id. at 1158.

On September 11, 2018, Plaintiff followed up at Premier with complaints of bilateral knee pain.  Tr. at 851. He described his symptoms as variable, aggravated by sitting and sleeping in any position, and that he also experiences nighttime pain in bed and while sitting.  Id.  Upon examination, Plaintiff appeared to be in no acute distress, was well nourished and well developed, with normal gait and neutral alignment, active and passive painful range of motion of the right hip and both knees, and decreased strength of his right hip and right knee.  Id. at 852-53.  On September 21, 2018, Plaintiff underwent injections to both knees.  Id. at 857-57.

On September 25, 2018, Plaintiff presented to a doctor with complaints of abdominal pain and was evaluated for a potential hernia.  Tr. at 641-45.  Examination

---

sitagliptin, which regulates levels of insulin in the body.  See https://www.drugs.com/janumet.html (last visited Apr. 5, 2023).  Prozac (generic fluoxetine) is an antidepressant used to treat MDD.  See https://www.drugs.com/prozac.html (last visited Apr. 5, 2023).  Lisinopril is an ACE inhibitor used to treat high blood pressure, congestive heart failure, and to improve survival after a heart attack.  See http://www.drugs.com/lisinopril.html  (last visited Apr. 8, 2022).  Celebrex (generic celecoxib) is an NSAID used to treat pain or inflammation caused by many conditions such as arthritis.  See https://www.drugs.com/celebrex (last visited Apr. 5, 2023).

findings were generally within normal limits, with normal gait, stance, and balance.  Id. at 643-44.  The doctor diagnosed Plaintiff with generalized abdominal pain and provided dietary advice.  Id. at 644.

On October 1, 2018, Plaintiff obtained a second opinion from James Zaccaria, D.P.M., regarding his foot pain.  Tr. at 634.  Plaintiff reported that his January surgery helped initially but the pain is back, albeit of a different nature than pre-surgery.  Id. Plaintiff exhibited mild pain upon palpation to the second and third plantar aspect of both feet, negative Tinel's sign,[10] no inflammatory changes in the third or fourth toe of either foot, severe inflexibility with severe equinus deformity in both feet, and no pain, discomfort or bruising to the plantar aspect of either foot.  Id.   Dr. Zaccaria reviewed the MRI scan showing a recurrent small neuroma in the second to third interspace of the left foot, with some inflammatory changes, acute soft tissue swelling and edema in the area. Id.  The doctor recommended stem cell treatment rather than further surgery, to avoid more scarring.  Id.

From January through August 2019, Plaintiff treated at Eagle Chiropractic P.C., for back pain, consistently complaining of aching/discomfort in his upper, middle and lower back and buttocks, all of which increased with movement, prolonged sitting and coughing/sneezing, and decreased with rest, chiropractic care and medicine.  Tr. at 1104-24, 1401-35.  During this period, on February 14, 2019, Plaintiff told his ATI physical

---

[10]Tinel's sign is a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve, indicating a partial lesion or the beginning regeneration of the nerve.  DIMD at 1716.

therapist that he was feeling worse because of pain in both knees, id. at 1169, and on March 5, 2019, that he felt better since receiving knee injections, with no throbbing pain but persistent cracking and snapping.  Id. at 1164.

On May 9, 2019, Plaintiff was seen at Premier for persistent bilateral knee pain, aggravated by any movement, stairs, and bending, and relieved by rest (use of a cane) and cortisone injection.  Tr. at 1441-42.  Upon examination, Plaintiff's upper and lower extremity deep tendon reflexes were intact bilaterally; his bilateral hips had normal strength, tone, and range of motion; his bilateral ankles were normal, with no swelling, edema or erythema; and his bilateral knees had normal strength and tone, with crepitus. Id. at 1442.  Plaintiff had normal gait and station.  Id.  The treatment provider assessed Plaintiff with chondromalacia[11] in his bilateral knees and discussed the potential benefits of knee braces.  Id.

On June 11, 2019, David Dzurinko, M.D., performed a consultative examination of Plaintiff.  Tr. at 1355-61.  Plaintiff reported chronic pain in his left foot and left knee dating to a trip and fall injury in 2016.  Id. at 1355.  He reported that stem cell injections in his left foot in 2018 reduced his foot discomfort but resulted in a left foot tremor that contributed to his insomnia, and that he underwent a left knee meniscectomy in 2018 but continues to experience knee pain, wears bilateral knee braces, requires a cane to avoid falling when ambulating, and that injections in 2018 and 2019 did not provide relief.  Id. at 1355-56.  Plaintiff also reported IBS and hypertension, both controlled through

---

[11]Chondromalacia is the softening of the articular cartilage.  DIMD at 352.

11

medication; type 2 diabetes, generally controlled with daily blood sugar testing; a cardiac

catheterization earlier in June 2019 due to abnormal tracing on EKGs; [12] and congenital

eye issues.  Id. at 1356-57.  He also reported taking antidepressant medication since

approximately 2005, prescribed by his primary care physician.  Id. at 1357, 1358.

Plaintiff's medications included Carvedilol, atorvastatin, Janumet, lisonopril,

methscopolamine, tramadol, cetirizine, aspirin, Tylenol, and fluoxetine.  Id. at 1358.[13]

His daily activities were limited mainly due to knee and foot pain, he was generally

independent with self-care, and he reported watching television, listening to the radio and

podcasts, reading and writing, and socializing with friends and family.  Id. at 1359.  Upon

examination, Plaintiff appeared as an obese individual in no acute distress, he exhibited

an antalgic gait due to left foot and left knee pain, could not walk on toes or heels, and

could squat to 20 percent of full, with some sensory loss to pinprick and pain bilaterally

---

[12]The cardiac catheterization was performed on June 4, 2019, after an EKG revealed an ejection fraction of 45-50%.  See tr. at 1615 (cardiology visit on Dec. 30, 2019).  Plaintiff had no active cardiac complaints and reported mild dyspnea on exertion, which he attributed to deconditioning.  Id. at 1612.

[13]Carvedilol is a beta-blocker used to treat heart failure and hypertension.  See https://www.drugs.com/carvedilol.html (last visited Apr. 5, 2023).  Atorvastatin is used to treat high cholesterol and to lower the risk of stroke, heart attack, or other heart complications in people with type 2 diabetes.  See https://www.drugs.com/atorvastatin.html (last visited Apr. 5, 2023).  Methscopolamine is used to reduce stomach acid.  https://www.drugs.com/methscopolamine.html (last visited Apr. 5, 2023).  Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain.  See https://www.drugs.com/tramdol.html (last visited Apr. 5, 2023).  Cetirizine (marketed as Zyrtec) is an antihistamine.  See https://www.drugs.com/cetirizine.html (last visited Apr. 5, 2023).  Fluoxetine (marketed as Prozac) is an antidepressant.  See https://www.drugs.com/fluoxetine.html (last visited Apr. 5, 2023).

in his lower extremities.  Id. at 1360-61.  His strength was 4/5 in all extremities, and his grip strength was 4/5 bilaterally.  Id. at 1361.  Dr. Dzurinko opined that Plaintiff's prognosis was fair.  Id.

Dr. Dzurinko also completed a medical source statement of Plaintiff's ability to work-related activities (physical).  Tr. at 1362-67.  The doctor opined that Plaintiff could lift and carry up to ten pounds frequently and twenty pounds occasionally; sit for eight hours, stand for three hours, and walk for two hours in an eight-hour workday; required the use of a cane to ambulate; could frequently reach, finger, and feel; occasionally operate foot controls, handle, and push/pull; occasionally climb stairs and ramps, balance, stop, and crouch; never climb ladders, kneel, or crawl; and although he had vision problems, he could avoid ordinary hazards in the workplace.  Id. at 1362-65.  He would not be able to read fine print but could read ordinary newspaper or book print and could view a computer screen, determine the shape and color of small objects, and frequently be exposed to environmental conditions except for unprotected heights, moving mechanical parts, operation of a motor vehicle, and extreme cold, which he could be exposed to only occasionally.  Id. at 1365-66.

On June 11, 2019, Beau Brendley, Psy.D., performed a psychological consultative examination of Plaintiff.  Tr. at 1343-47.  Plaintiff denied any past psychiatric hospitalizations and denied any past or current mental health treatment.  Id. at 1343.  He reported difficulty falling and staying asleep, trauma and flashbacks related to finding his mother-in-law dead, panic attacks, and depressive symptoms including sad mood, feelings of guilt, hopelessness, loss of usual interest, irritability, fatigue, concentration

13

difficulties, and social withdrawal.  Id. at 1343-44.  He denied suicidal and homicidal ideation, manic symptoms, and thought disorder.  Id. at 1344.  On mental status examination, Plaintiff reported feeling anxious and appeared to have mildly impaired memory "due to unknown."  Id. at 1345.  He was cooperative, well-groomed, had appropriate eye contact, fluent speech, coherent and goal-directed thought processes, appropriate affect, clear sensorium, and normal orientation to person, place, and time, with normal motor behavior, intact attention and concentration, average cognitive functioning, and good insight and judgment.  Id. at 1345-46.  Dr. Brendley diagnosed Plaintiff with MDD, single episode mild, and trauma, NOS (not otherwise specified).  Id. at 1346.[14]

Dr. Brendley also completed a medical source statement of Plaintiff's ability to work-related activities (mental), concluding that Plaintiff did not have any mental limitations.  Tr. at 1348-50.

On June 14, 2019, Molly Cowan, Psy.D., completed the mental health component of Plaintiff's initial disability determination.  Tr. at 87-89.  Dr. Cowan opined that Plaintiff had a non-severe depressive, bipolar or related disorder, with mild impairment of his ability to concentrate, persist, or maintain pace, and to adapt or manage himself, and no impairment in his ability to understand, remember, or apply information, and to interact with others.  Id. at 88-89 (addressing "paragraph B" criteria of the Listings).  The

---

[14]The trauma disorder is mentioned elsewhere in the record as PTSD.  See, e.g., tr. at 1679, 1805, 1806.

doctor further found that the evidence did not establish the presence of the "paragraph C" criteria of the Listings.  Id. at 89.

On July 10, 2019, Kevin Hollick, D.C., completed the physical portion of Plaintiff's initial disability determination.  Tr. at 89-96.  Dr. Hollick opined that Plaintiff could frequently lift and/or carry up to ten pounds and occasionally up to twenty pounds, and could stand and/or walk for a total of four hours and sit for a total of six hours in an eight-hour workday.  Id. at 90.  He could occasionally use left foot controls, climb ramps/stairs, balance, kneel, crouch, and crawl, and never climb.  Id. at 90-91.  He should avoid concentrated exposure to vibration and hazards such as machinery and heights.  Id. at 91-92.

On August 29, 2019, Plaintiff returned to Premier following an acute medial meniscus injury of his right knee.  Tr. at 1439-40.  Upon examination, Plaintiff exhibited an antalgic gait with generally normal findings as to his bilateral ankles, knees, and hips. Id. at 1440.  The treatment provider assessed Plaintiff with chondromalacia of both knees and an acute meniscus injury of his right knee, for which he referred him for an MRI and prescribed tramadol for pain.  Id. at 1440.

On September 9, 2019, Plaintiff sought chiropractic treatment with Richard Gorgo, Jr., D.C.  Tr. at 1557-1601.  Plaintiff chiefly complained of acute pain in the front of his left thigh, knee, and ankle, pain in his middle and lower back, and pain in his left buttock, and pain in the back of his left thigh, knee, calf, ankle, and foot.  Id. at 1557.  He also complained of chronic pain in the front and back of his left foot and ankle.  Id.  Dr. Gorgo noted that Plaintiff had fair health and was expected to make fair progress and to

recover with some residuals.  Id. at 1560.  The doctor discharged Plaintiff on October 29, 2019, stating that he has "too much pain with treatment," id. at 1599, and that he had "reached maximum medical improvement."  Id. at 1600.

On November 13, 2019, state agency assessor John Gavazzi, Psy.D., assessed Plaintiff's mental impairments at the reconsideration level.  Tr. at 107-08.  Dr. Gavazzi's assessment is identical to Dr. Cowan's except that Dr. Gavazzi also found non-severe anxiety.  Id.

On December 10, 2019, state agency assessor Michael Brown, D.O., assessed Plaintiff's physical impairments at the reconsideration level.  Tr. at 109-15.  Dr. Brown's assessment is identical to that of Dr. Hollick made at the initial determination level, except Dr. Brown found that Plaintiff could stand and/or walk two hours longer, for a total of six hours in an eight-hour workday.  Id. at 110.  Dr. Brown noted that use of a cane is not supported by the most recent medical evidence, and that a consultant's opinion to the contrary appeared to be based on Plaintiff's subjective complaints of pain rather than on objective findings.  Id. at 113.

On December 13, 2019, x-rays were taken of Plaintiff's lumbar spine, thoracic spine, and pelvis.  Tr. at 1608-10.  The lumbar spine x-ray revealed mild DDD, bilateral L5 defects with at least grade 2 spondylolisthesis, mild T12 and superior endplate L1 compression fractures, and at least grade 2 spondylolisthesis of L5 or S1.  Id. at 1608. The thoracic spine x-ray showed mild to moderate multilevel DDD, and mild to moderate T9-L1 compression fractures of indeterminate age.  Id. at 1609.  The pelvis x-ray showed mild degenerative change of the hips with no acute fracture.  Id. at 1601.  In January

2020, an MRI scan of Plaintiff's lumbar spine revealed, among other things, grade 1 spondylolisthesis secondary to chronic L5 defects, and spinal stenosis of L4-L5 and L5-S1.  Id. at 1625-26.

On January 15, 2020, Plaintiff underwent arthroscopic right knee surgery to repair a lateral meniscus tear.  Tr. 1627-29.  A follow-up on January 30, 2020, indicated no post-operative complications and "much improved" symptoms, with mild pain, 100% weight-bearing and improvement in his activity level.  Id. at 1637.  Upon examination, Plaintiff exhibited a normal gait, no tenderness to palpation of either knee, no crepitus, slightly reduced flexion of the knees, and stable knees.  Id. at 1638.  Plaintiff denied pain in his right knee and indicated that he would start home exercises.  Id.

On February 11, 2020, Plaintiff returned to podiatrist Dr. Rice with complaints of intermittent, lancinating pain in his forefeet.  Tr. at 1631.[15]  Plaintiff reported that his foot pain had improved, but that his left foot was still painful on occasion.  Upon examination, Plaintiff exhibited pain to the distal left second and third interspace, and otherwise had a normal podiatric neurological and musculoskeletal examination with normal pedal pulses, normal gait and station, normal sensation from L1 to S2 bilaterally, and normal manual muscle strength and tone in his bilateral lower extremities.  Id.  Dr. Rice indicated that he could not reliably differentiate symptoms from the lumbar fracture/nerve compression versus neuroma, and recommended that Plaintiff follow up with Kenan Aksu, D.O., as to the compression fractures.  Id.

---

[15]Lancinating pain describes pain that is "tearing, darting or sharply cutting." DIMD at 1004.

On April 14, 2020, Dr. Aksu completed a Physical Capabilities Questionnaire indicating that Plaintiff could "not at all" perform every listed activity, including sit, stand, walk, bend, squat, climb stairs or ladders, kneel, crawl, use foot controls, and drive. Tr. at 1670. Dr. Aksu opined that Plaintiff could not return to work, including sedentary duty, because of "severe instability of his lumbar spine." Id. at 1672.

Between May 1 and October 2, 2020, Plaintiff participated in numerous teletherapy sessions with Life in Progress Counseling. Tr. at 1803-07. Although not entirely legible, the notes indicate that Plaintiff routinely arrived on time for his teletherapy and exhibited a spontaneous affect. Id. Notes from August 13, 2020, indicate that he was learning to manage his symptoms of PTSD.

From June through August 2020, Plaintiff attended four mental health treatment sessions with Muhammed Nadeem Shamsi, M.D., for complaints of anxiety and depression. Tr. at 1678-86. Treatment records indicate that Plaintiff had an anxious and depressed mood with a depressed affect and feelings of hopelessness. An initial mental status examination revealed that Plaintiff had a neat appearance, normal psychomotor behavior, and oriented to person, place and time, with fluent speech, good insight and judgment, no delusions or hallucinations, and no homicidal or suicidal ideation. Id. at 1679. Dr. Shamsi diagnosed Plaintiff with DDD and PTSD, unspecified, and opined that his prognosis was fair. Id. at 1679-80.

On July 7, 2020, Plaintiff underwent an L4-L5 and L5-S1 transforaminal lumbar interbody fusion, insertion of a biomechanical fusion device, pedical screw instrumentation at L4-S1, aspiration of bone marrow from L5 vertebral body and use of

18

allograft bone.  Tr. at 1726.  There were no complications, and Plaintiff reported pain during recovery with movement.  Id.  Plaintiff had a series of post-operative follow-ups at Premier through October 1, 2020, id. at 1750-61, at which time Dr. Aksu noted slight improvement in Plaintiff's symptoms with mild pain, 100% weight bearing, normal gait and station, and normal lumbosacral spine examination, and the doctor recommended continued physical therapy.  Id. at 1751-52.  The therapy was putting some stress on Plaintiff's left knee.  Id. at 1752.

In August and September 2020, Dr. Rice noted that Plaintiff was taking Lyrica for nerve pain in his left foot with good results.  Tr. at 1794.  Upon examination, Plaintiff exhibited pain in the distal second and third interspaces of his left foot, and otherwise normal neurological and musculoskeletal findings, including normal gait and station, normal sensation from L1 to S2 bilaterally, and normal manual muscle strength and tone. Id. at 1794-95.

On August 13, 2020, Plaintiff saw Richard Balotti, Jr., M.D., at Premier, with complaints of chronic pain in the lower left extremity and lower back.  Tr. at 1674-76. Plaintiff reported marginal results with pain medication but good results with physical therapy.  Id. at 1674.  The Review of Systems portion of the notes do not indicate any issues.  Id. at 1675.  Upon examination, Plaintiff had normal sensation and coordination, 5/5 strength in all extremities, normal gait and station, equal heel rise for both feet, no findings of tenderness to palpation, pain, laxity, crepitus, or muscle spasm of his lumbosacral spine.  Id. at 1676.

On October 6, 2020, Dr. Rice completed a physical RFC questionnaire.  Tr. at 1797-1800.  Dr. Rice indicated that Plaintiff had Morton's neuroma and sensory neuropathy with pain and burning in his left foot and a fair prognosis.  Id. at 1797.  The doctor opined that Plaintiff could sit for at least six hours and stand/walk for about two hours in an eight-hour workday.  Id. at 1798.  Dr. Rice further opined that Plaintiff could lift ten pounds occasionally and less than ten pounds frequently, required a sit/stand option, had postural limitations, would need to take unscheduled breaks, and would be absent from work about twice per month.  Id. at 1799-1800.

### C.    Other Evidence

Plaintiff testified at the October 15, 2020 administrative hearing that he stopped working in January 2018 when he had surgery on his left foot, which did not heal properly and contributed to other musculoskeletal problems.  Tr. at 46.  Prior to the surgery, Plaintiff could walk and/or stand less than five minutes before experiencing extreme pain in his foot, causing him to lose balance, and he began using a cane in September 2016, including at work.  Id. at 47-48.  Post-surgery, Plaintiff had difficulty bearing weight on his left foot, even with the use of his cane, and he remains unable to bear full weight confidently.  Id. at 49, 50.  He estimated that he can stand for less than five minutes and walk five feet with the assistance of a cane, id. at 51, and that he can go up and down one flight of stairs while using a railing.  Id. at 52.  He continues to use a cane and to treat his foot pain with injections and Lyrica, but it does not reduce the pain enough to increase his activities.  Id. at 50-51.  Plaintiff testified that he underwent right knee surgery without improvement in his pain, and that back surgery in July 2020

changed the nature of his back pain from a "piercing pain" to a "constant, dull, aching pain." Id. at 52. He "absolutely cannot" kneel on his right knee and cannot stoop down to pick up dropped keys or recover shoes from underneath a bed. Id. at 52-53.

On questioning by counsel, Plaintiff testified that he has non-ischemic cardiomyopathy which likely contributes to his shortness of breath. Tr. at 54-55. He also has vision issues which limit his ability to use any digital interface to about ten minutes at a time, and he needs a magnifier to read fine print. Id. at 55. Plaintiff has taken various medications for hypertension, with side effects ranging range from gastrointestinal issues to increased depression and anxiety. Id. at 56. His anxiety is daily, particularly when he is having extreme bouts of pain, and it interferes with his ability to focus and concentrate. Id. at 56-57.[16]

A VE also testified at the hearing and characterized Plaintiff's prior work as a teacher of the learning-disabled and college faculty member as skilled and light-exertional jobs with a specific vocational preparation ("SVP") score of 7 and 8, and his prior work as a clinical therapist and residence supervisor as skilled and sedentary jobs with an SVP of 6 or 7. Tr. at 57-58.[17] The ALJ asked the VE to consider a series of

---

[16]Plaintiff's testimony is largely consistent with his function report and supplemental function questionnaire. Tr. at 306-13, 314-16. Plaintiff's testimony is also largely consistent with a third-party function report completed by his spouse, Steven Mayo, in March 2019. Id. at 276-83.

[17]Light work involves lifting no more than twenty pounds at a time with frequent lifting and carrying of objects weighing up to ten pounds. Even though the weight lifted may be little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b). In contrast, sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files,

hypotheticals.  Relevant to his decision, the ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education, and work experience who could frequently lift up to ten pounds and occasionally lift up to twenty pounds, with the following limitations: Sitting for eight hours, standing for three hours and walking for two hours during an eight-hour workday; medically required to use a cane, while carrying small objects in the other hand; could frequently perform manipulative activities with the bilateral upper extremities but could only occasionally use the bilateral lower extremities to operate foot controls; occasionally balance, stoop, crouch and climb stairs, but never climb ladders, kneel or crawl; could avoid ordinary hazards in the workplace such as boxes on the floor; could not read very small print but could read ordinary newsprint or book print and could view a computer screen; and could frequently be exposed to environmental conditions other than occasional exposure to unprotected heights, moving mechanical parts, operation of a motor vehicle or extreme cold.  Id. at 58-60.[18]  The VE testified that such a

_____

ledgers, and small tools.  Id. § 404.1567(a).  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Id.  Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met.  Id.

[18]The ALJ did not use the phrase "light work" when presenting the relevant hypothetical, tr. at 58-60, but the lifting limitations given by the ALJ correspond to the regulatory definition of light work, and the ALJ later clarified that the hypothetical was for light work.  Id. at 73.  Following Plaintiff's testimony from follow-up questions that he sometimes lifted up to fifty pounds when working as a crisis interventionist, id. at 67-68, the VE testified that the job "would still be sedentary as traditionally performed."  Id. at 69.  Similarly, the VE testified that the resident supervisor job was medium as performed by Plaintiff, but is sedentary as traditionally performed.  Id. at 75.

person could perform Plaintiff's past work as a resident supervisor and clinical therapist. Id. at 60.

If the person was limited to sedentary work and could sit for six hours, and stand and walk for less than one hour each in an eight-hour workday, the VE testified that work would be precluded.  Tr. at 61-62.  Similarly, work would be precluded if the individual required unscheduled breaks throughout the day and would be absent from work more than one to two times per month, id. at 62, and if he needed to shift from sitting to standing every thirty minutes and to rely on his cane while standing for five-minute intervals.  Id. at 77

### D.   Consideration of Plaintiff's Claims

As previously noted, Plaintiff argues that the ALJ's opinion is not supported by substantial evidence because the ALJ improperly evaluated the medical opinion evidence and erred in assessing Plaintiff's RFC, and that the ALJ and the Appeals Council judges were not properly appointed and therefore had no legal authority to adjudicate his application for benefits.  Docs. 6 & 8.

#### 1.   Evaluation of the Medical Opinion Evidence

Plaintiff argues that the ALJ improperly relied on outdated state agency assessments and substituted her own lay judgment for those of a medical professional, particularly the medical opinion evidence of Dr. Rice.  Doc. 6 at 2-7; Doc. 8 at 1-4. Defendant counters that the ALJ's consideration of the medical opinion evidence is supported by substantial evidence.  Doc. 7 at 16-22.

The ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. § 404.1520c(a).[19]  The regulations list the factors to be utilized in considering medical opinions:  supportability, consistency, treatment relationship including the length and purpose of the treatment and frequency of examinations, specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program.  Id. § 404.1520c(c).  The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).  The regulations explain that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id. § 404.1520c(c)(1).  In addition, "[t]he more consistent a medical opinion(s) . . .  is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be."  Id. § 404.1520c(c)(2).

---

[19]In contrast, the regulations governing applications filed before March 17, 2017, spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. § 404.1527.

The change in the regulations did not change the basic rule that "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason."  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at 429 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Here, the ALJ assessed the medical opinion evidence as follows:

> The opinions on the disability claim forms for insurance purposes are not persuasive, as they are temporary restrictions ([tr. at 754-912; 1669-72]).  [Dr. Rice] noted that [Plaintiff] had not yet achieved maximum medical improvement ([id. at 761-66]).  However, the acknowledgment that [Plaintiff] is not limited as to mental capacity seems persuasive and consistent with the record as a whole ([id. at 766]).  In April 2020, [Dr. Aksu] opined that [Plaintiff] could perform no work – even at the sedentary level – due to issues with his lumbar spine that required surgery.  [Id. at 1670-72].  This opinion is also not persuasive both due to being a temporary restriction and due to a lack of support through either citations to objective evidence or to treatment records.
>
> On June 11, 2019, consultative examiner [Dr. Dzurinko] assessed a light [RFC] with standing three hours, walking two hours, the need for a cane, occasional foot controls with bilateral feet, and manipulative, postural and environmental limitations ([tr. at 1353-69]).  This opinion is persuasive.  However, it is worth noting that [Plaintiff] had not yet had right knee surgery or received updated contact lenses.  In addition, Dr. Dzurinko noted a finding of 4-5/5 strength in the upper extremities and 4/5 grip strength bilaterally, but other records show 5/5 strength in the upper extremities, and there is no mention of decreased ability to grasp or grip (e.g., [id. at

1614]).  Although there is no related diagnosis to explain the finding of decreased strength at the consultative examination, this opinion is consistent with the examination results and found to be persuasive.

Dr. Rice completed a physical [RFC] questionnaire in October 2020 ([tr. at 1797-803]).  He indicated that [Plaintiff] had Morton's neuroma and sensory neuropathy with a fair prognosis and pain and burning [in] his left foot.  He indicated that [Plaintiff] could sit for at least six of eight hours and stand/walk for about two.  He wrote that [Plaintiff] would need a sit/stand option, would need to take unscheduled breaks and could lift 10 pounds occasionally and less than 10 pounds frequently.  [Plaintiff] would have postural limitations and would be absent from work about twice a month.  This opinion is somewhat consistent with the medical evidence of record.  However, the evidence does not support findings including the needs for a sit/stand option or absenteeism of twice a month.  It is only partially persuasive.

As for the DDS opinions, [Dr. Hollick,] on July 10, 2019[,] assessed a range of light work with standing/walking 4 hours, sitting 6 hours, occasional left foot controls and postural and environmental limitations ([tr. at 81-96]), and [Dr. Brown], on December 10, 2019[,] assessed a light RFC with postural and environmental limits ([id. at 98-115]).  These opinions are persuasive, as they are supported by detailed explanations and [are] generally consistent with the record as a whole, including diagnostic studies, findings on exam, and history of surgery on the left foot, bilateral knees, and lumbar spine (e.g., [id. at 629-39, 834-35, 848, 977-1061, 1620-29)].  However, Dr. Hollick's opinion more accurately takes into account [Plaintiff's] ongoing foot pain, as well as back pain that necessitated surgery in July 2020 (e.g., [id. at 1644]).

Tr. at 25.

Plaintiff argues that the ALJ improperly relied on "outdated" state agency

opinions rather than on later medical opinions with greater assessed limitations.  Doc. 6 at

3.  In particular, Plaintiff argues that the ALJ erred by accepting Dr. Brown's opinions

because he reviewed Plaintiff's medical record in December 2019, and therefore did not have records from Plaintiff's January 2020 knee surgery and July 2020 back surgery, or Dr. Rice's October 2020 medical opinion that Plaintiff could not be able to sustain work because of his need for unscheduled breaks and monthly absences.  Id.

While reliance on an outdated medical assessment may in some instances prove problematic, there are several reasons why Plaintiff's argument fails.  First, controlling regulations provide that the ALJ is responsible for assessing a claimant's RFC, and not a physician.  See 20 C.F.R. § 404.1546(c) (the ALJ "is responsible for assessing your [RFC]"); Faux v. Saul, Civ. No. 17-1476, 2021 WL 1207720, at *2 (M.D. Pa. Mar. 20, 2021) ("[T]he RFC assessment is the exclusive province of the ALJ and not the province of treating physicians or other medical providers.").  Second, Dr. Brown rendered his opinion nearly two years after Plaintiff's alleged onset date, by which time the doctor had the benefit of significant medical evidence.  See Chandler v. Astrue, 667 F.3d 356, 361 (3d Cir. 2011) ("[T]here is always some time lapse between a state agency physician's opinion and the ALJ's decision.").

Third, as the ALJ's opinion quoted above demonstrates, the ALJ explained why she accepted or rejected the various medical opinions with reference to whether they were consistent with the medical evidence summarized elsewhere in her opinion.  Tr. at 25.  For example, the ALJ noted that although Dr. Aksu opined in April 2020 that Plaintiff had extreme limitations, the doctor's assessment preceded Plaintiff's back surgery and the restrictions were therefore temporary.  Id. at 25 (citing id. at 1670-72).  Moreover, in summarizing the most recent treatment record -- Dr. Balotti's August 2020

examination after Plaintiff's knee and back surgeries -- the ALJ noted no complaints listed in the "Review of Symptoms," with examination findings of normal sensation and coordination, 5/5 strength in all extremities, normal gait and station, equal heel rise for both feet, and no findings of tenderness to palpation, pain, laxity, crepitus, or muscle spasm of his lumbosacral spine. Id. at 24 (citing id. at 1675-76). The ALJ also considered Plaintiff's testimony and function report, and the third-party function report completed by Plaintiff's spouse. Id. at 20-21, 25. Therefore, it cannot fairly be said that the ALJ rejected evidence without explanation. See Plummer, 186 F.3d at 429.

Plaintiff also argues that the ALJ improperly rejected Dr. Rice's opinion on the basis of the ALJ's lay medical judgment, noting that although the ALJ found some of the doctor's opinions to be persuasive, she did not adopt the doctor's opinions regarding Plaintiff's left foot pain, his sit/stand and lift/carry limitations, or his need for unscheduled breaks. Doc. 6 at 5-6. However, the ALJ identified and discussed ample evidence, throughout her opinion, that was inconsistent with Dr. Rice's opinion, including the assessment of Dr. Dzurinko and treatment notes, including from Dr. Rice, indicating improvements in Plaintiff's foot pain following neuroma surgery and good response to other treatment modalities. These observations are consistent with the August 2020 examinations noted above, in which Plaintiff exhibited normal sensation and coordination, 5/5 strength in all extremities, and normal gait and station. Tr. at 1675-76. As a result, the ALJ reasonably accounted for Plaintiff's foot pain by limiting him to sitting for eight hours, standing for three hours, walking for two hours, and using a cane, consistent with Dr. Dzurinko's opinion. See Chandler v. Astrue, 667 F.3d 356, 362 (3d

Cir. 2011) (ALJ did not improperly inject his lay opinion in fashioning RFC and was "not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision").

To the extent Plaintiff argues that the ALJ erred by not considering certain aspects of the record, remand is not required.  An ALJ is not required to provide a "written evaluation of every piece of evidence," provided she "articulates at some minimum level her analysis of a particular line of evidence."  Edinger v. Saul, 432 F. Supp. 3d 516, 529 (E.D. Pa. 2020) (quoting Phillips v. Barnhart, 91 F. App'x 775, 780 n.7 (3d Cir. 2004)). As previously stated, the ALJ provided a detailed narrative summary of Plaintiff's medical record, explained why she accepted or rejected the various medical opinions of record, and considered Plaintiff's subjective reports and the reports of his husband.

Finally, Plaintiff argues that the ALJ should have ordered an updated consultative examination.  Doc. 6 at 4.  I disagree.  The regulations provide that an ALJ "may" obtain a consultative examination to resolve an inconsistency in the evidence or when the evidence is insufficient to reach a decision.  20 C.F.R. § 404.1519a.  See also Bullock v. Colvin, Civ. No. 13-3692, 2015 WL 3999520, at *4 (E.D. Pa. July 1, 2015) (decision whether to order a consultative examination is within ALJ's discretion).  Here, the ALJ did not identify an inconsistency in the record that warranted an updated consultative examination, nor can the lengthy medical record be deemed insufficient to reach a decision.  Therefore, I find that Plaintiff's argument is without merit.

2.    The ALJ's RFC Assessment

Plaintiff also argues that the ALJ's opinion is not supported by substantial evidence because the ALJ failed to reasonably explain her assessment of Plaintiff's RFC as to his mental limitations.  Doc. 6 at 7-14; Doc. 8 at 5-6.  Defendant counters that the ALJ's RFC determination is supported by substantial evidence.  Doc. 7 at 22-27.

The RFC assessment is the most a claimant can do despite his limitations.  20 C.F.R. § 404.1545(a)(1).  In assessing RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, including those that are not severe.  Id. § 404.1545(a)(2).  However, the ALJ is not required to include every impairment a clamant alleges.  Rutherford, 399 F.3d at 554.  Rather, the RFC "must 'accurately portray' the claimant's impairments," meaning "those that are medically established," which "in turn means . . . a claimant's *credibly established limitations*."  Id. (emphasis in original) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984) and citing Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002); Plummer v. Apfel, 186 F.3d 422, 431 (3d Cir. 1999)).  "In making the [RFC] determination, the ALJ must consider all evidence before [her]."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).

As previously noted, the ALJ's RFC assessment contained no mental health-related limitations.  Tr. at 19.  In her opinion, the ALJ found that Plaintiff's medically determinable mental impairments of depressive disorder and trauma disorder, considered singly and in combination, do not cause more than minimal limitation in his ability to perform basic work activities, id. at 16, and because they caused no more than "mild"

limitation in the four broad areas of mental functioning (the "B criteria"), the

impairments are non-severe.  Id. at 16-17.[20]  The ALJ summarized the mental health

evidence of record, including the relevant medical opinions, as follows:

> [Plaintiff] has undergone conservative, routine and minimal
> treatment for his mental health impairments.  He has been
> taking Prozac, which was prescribed by his family doctor for
> symptoms of anxiety and depression, and he took Wellbutrin
> before that ([tr. at 1678]).  He began seeing Muhammed
> Nadeem Shamsi, P.C., in June 2020, and was diagnosed with
> [MDD], recurrent severe without psychotic features, and
> [PTSD], unspecified ([id. at 1679]).  The record includes
> treatment notes . . . from May 2020 through October 2020
> ([id. at 1802-07]).
>
> [Plaintiff] underwent a mental consultative examination with
> [Dr. Brendley] in June 2019 ([tr. at 1343-52]).  [Plaintiff]
> reported that he currently lived with his husband and his
> mother.  He said that he was not working due to pain in his
> left foot, lower back and bilateral knees.  He reported no
> psychiatric hospitalizations or past or present outpatient
> treatment.  He reported some depressive symptoms and panic
> attacks.  He denied thought disorder, but he did report some
> difficulty with concentrating.  His mental status examination
> was unremarkable with only mildly impaired memory skills
> noted.
>
> . . . .
>
> The June 11, 2019 opinion of consultative examiner [Dr.
> Brendley] is persuasive as to the mental impairments being
> non-severe ([tr. at 1343-52]).  This assessment is generally
> consistent with findings on exam on this occasion and other
> occasions (e.g., [id. at 977-1061, 1343-52]).  However,
> [Plaintiff] is given the benefit of the doubt as to reported
> problems sleeping and infrequent panic attacks in finding

---

[20]Specifically, the ALJ found that Plaintiff has mild limitation in the functional
areas of concentration, persistence, and pace, and adapting and managing oneself, and no
limitation in the areas of understanding, remembering or applying information, and in
interacting with others.  Tr. at 16.

> mild limits in concentrating, persisting, and maintaining pace and adapting.
>
> As for the Disability Determination Services (DDS) opinions, [Dr. Cowan], on June 14, 2019 ([tr. at 81-96]), and [Dr. Gavazzi] on November 13, 2019 ([id. at 98-115]) assessed non-severe mental impairments with non, none, mild, and mild for the "paragraph B" criteria limitations. These opinions are persuasive, as they are supported by reasonable explanations and [are] generally consistent with the evidence in its entirety, including a history of conservative outpatient treatment consisting of psychotropic medication and no counseling and findings that [Plaintiff] was generally oriented, alert, and cooperative with good grooming, appropriate eye contact, normal motor behavior, no observable agitation or anxiety, goal-directed thought processes, appropriate mood and affect, appropriate behavior, intact attention and concentration with ability to do serial-7s, and average cognitive functioning (e.g., [id. at 982, 989, 993, 1004, 1011, 1019, 1038, 1343-52, 1357, 1614]).

Id. at 15-17. The ALJ explained that the limitations identified in the "paragraph B" criteria are used to rate the severity of mental impairments and do not constitute an RFC assessment, id. at 17, and determined in the context of the RFC assessment that although Plaintiff has non-severe mental health impairments, "no mental limitations are supported by the conservative, routine treatment record and the generally unremarkable mental status examinations." Id. at 26.

Plaintiff argues that because the ALJ found "mild" limitations in two (of four) broad areas of functioning at step two of the sequential evaluation, the ALJ erred by failing to include any mental limitations in her subsequent RFC assessment, or to discuss why no such limitations were included. Doc. 6 at 7-10; Doc. 8 at 5-6. In doing so,

Plaintiff relies almost exclusively on cases that arise outside the Third Circuit.  See Doc.
6 at 8, 10; Doc. 8 at 5.[21]

I disagree with Plaintiff that the ALJ was required to impose mental limitations in
this case.  The Third Circuit has explained the interplay between the paragraph B criteria,
which are considered at steps two and three of the sequential evaluation, with the later
RFC analysis, which is done at step four.

> [N]o incantations are required at steps four and five simply
> because a particular finding has been made at steps two and
> three.  Those portions of the disability analysis serve distinct
> purposes and may be expressed in different ways.  When
> mental health is at issue, the functional limitation categories
> are "used to rate the severity of mental impairment(s)[.]"
> SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996).  While
> obviously related to the limitation findings, the RFC is a
> determination of "the most [a claimant] can still do despite
> [his] limitations" "based on all the relevant evidence in [the]
> case record."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1);
> SSR 96-8p, at *2.  It "requires a more detailed assessment [of
> the areas of functional limitation] by itemizing various
> functions contained in the broad [functional limitation]
> categories[.]"  SSR 96-8p, at *4.  And, unlike the findings at
> steps two and three, the RFC "must be expressed in terms of
> work-related functions[,]" such as by describing the
> claimant's "abilities to:  understand, carry out, and remember
> instructions; use judgment in making work-related decisions;
> respond appropriately to supervision, co-workers and work
> situations; and deal with changes in a routine work setting."

---

[21]For the proposition that limitations found at one step of the sequential evaluation
"cannot simply disappear with no explanation," Doc. 8 at 5, Plaintiff also cites one case
from the Third Circuit, Ramirez v. Barnhart, 372 F.3d 546, 552-54 (3d Cir. 2004).
However, in Ramirez the Third Circuit remanded because the ALJ found that the plaintiff
"*often* suffered from deficiencies in concentration, persistence, or pace," but that the
limitation to one -to- two step tasks did not address Plaintiff's deficiency in pace.  Id. at
554 (emphasis in original).  In contrast, here the ALJ found only "mild" limitations in
concentration, persistence, and pace, and explained why she did not include mental
limitations in her RFC.  Tr. at 26.

Id. at *6.  In short, the findings at steps two and three will not necessarily translate to the language used at steps four and five.

Hess v. Comm'r of Soc. Sec., 931 F.3d 198, 209 (3d Cir. 2019).  Thus, the ALJ's failure to include limitations related to mental impairments found mild at steps two and three does not necessarily result in error at step four.  See Brumfield v. Saul, Civ. No. 19-4555, 2020 WL 4934315, at *8 (E.D. Pa. Aug. 21, 2020) (affirming where ALJ found mild limitations in "paragraph B" criteria at step two and RFC assessment did not include limitations related to non-severe mental impairments).

Despite the differences between the analyses at steps two and four, the findings at step two are "plainly relevant" to the ALJ's later step four analysis which involves 'the claimant's actual impairments.'"  Brumfield, 2020 WL 4934315, at *4 (quoting Hess, 931 F.3d at 209).  The step four determination must be made after a narrative discussion that "'reflect[s] the claimant's particular impairments, including those embodied in the functional limitation findings' from the earlier steps."  Id. (quoting Hess, 931 F.3d at 209).

In Brumfield, the court found no error in the ALJ's failure to include limitations related to non-severe mental impairments in the RFC assessment despite finding mild limitations in the paragraph B criteria at step two.  2020 WL 4934315, at *8.  The court determined that the ALJ properly considered the evidence regarding the claimant's mental health impairments, noting that such evidence was "sparse," "limited," and "overwhelmingly normal," id. at *6, *8, and found that the ALJ "understood [the] impact [of the claimant's mental health impairments] before determining [the claimant's] RFC."

34

Id. at *5.  In addition, the court observed that "[t]he ALJ also adequately conveyed the decision to not include any mental limitations in [the claimant's] RFC and the related hypothetical."  Id.  Moreover, considering the sparsity of the mental health treatment evidence, the court found that, even if the ALJ's consideration of the mild "paragraph B" findings at step four was incomplete, any error was harmless.  Id. at *6.

Here, as the ALJ correctly observed, the record reveals generally unremarkable mental status examinations.  Not surprisingly, therefore, none of the doctors who treated Plaintiff's physical conditions noted concerns regarding Plaintiff's mental status.  Similarly, although Dr. Brendley noted that Plaintiff had anxious mood and mildly impaired memory in his mental status examination of Plaintiff, tr. at 1345-46, and Dr. Shamsi's treatment records indicate that Plaintiff had anxious and depressed mood, id. at 1679, records from these mental health professionals yielded generally normal findings -- so much so that Dr. Brendley opined that Plaintiff had no mental functional limitations whatsoever.  Id. at 1348-50.  These findings constitute substantial evidence supporting the ALJ's RFC determination.  Moreover, as in Brumfield, the ALJ "adequately conveyed the decision to not include any mental limitations in [the claimant's] RFC and the related hypothetical."  Brumfield, 2020 WL 4934315, at *5.  "[T]he undersigned has considered the functional limitations resulting from all of [Plaintiff's] medically determinable impairments, including those that are non-severe.  The evidence does not support a finding of any additional functional limitations other than those included in [the RFC]."  Tr. at 15; see also id. at 26 ("Although [Plaintiff] has non-severe mental health

impairments, no mental limitations are supported by the conservative, routine treatment record and the generally unremarkable mental status examinations.").

Because the ALJ adequately addressed the mental health treatment evidence in the record in concluding that the functional impact of Plaintiff's mental health impairment was so slight that it did not require inclusion in the RFC assessment or the hypothetical posed to the VE, tr. at 26, I find no error in the ALJ's analysis.  See Brumfield, 2020 WL 4934315, at *5-6; see also Northrup v. Kijakazi, Civ. No. 20-412, 2022 WL 889968, at *4-5 (M.D. Pa. Mar. 24, 2022) (no error where ALJ did not include limitations in RFC for mild limitations in the B criteria where ALJ affirmatively explained that the RFC assessment incorporated the limitations found in the B criteria mental function analysis); Long v. Kijakazi, Civ. No. 20-1358, 2022 WL 609620, at *8 (D. Del. Jan. 31, 2022) (failure to include work-related limitations in the RFC was consistent with the analysis at step two finding only mild mental impairments), R&R adopted, 2022 WL 609160 (D. Del. Feb. 15, 2022); Hernandez v. Kijakazi, Civ. No. 22-1556, 2022 WL 17751355, at *9 (D.N.J. Dec. 19, 2022) (same).[22]

---

[22]Plaintiff also argues that the ALJ should have evaluated the impact of Plaintiff's mild limitations in concentration, persistence, or maintaining pace and in adapting and managing himself "on [his] ability to perform his skilled past relevant work, which would undoubtedly be impacted by any degree of mental limitation."  Doc. 8 at 6.  I note, however, that both Brumfield and Northrup involved mild limitations in concentration, persistence, and pace, and the ALJs found the claimants could return to past relevant work that was skilled.  Brumfield, 2020 WL 4934315, at *2, 5; see also Brumfield v. Saul, Civ. No. 19-4555, Doc. 11-2 at 43 (VE testimony that claimant's past work as collection clerk with SVP 5 was skilled); Northrup, 2022 WL 889968, at *5 (claimant's past relevant work of performance manager was skilled work with an SVP of 9); O'Connor v. Comm'r of Soc. Sec, 466 F. App'x 96, 101-03 (3d Cir. 2012) (plaintiff

For all of the aforementioned reasons, I conclude that the ALJ's RFC determination is supported by substantial evidence.

### 3.    Legal Authority of the ALJ and Appeals Council Judges

Finally, Plaintiff argues that the ALJ and Appeals Council judges lacked authority to decide this matter based on the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3346(a), which allegedly operated to render their appointments improper. Doc. 6 at 14-15; Doc. 8 at 6-10. Specifically, Plaintiff argues that because Nancy Berryhill became Acting Commissioner on January 20, 2017, and was authorized to serve in that role for only 210 days, her term as Acting Commissioner ended on November 16, 2017, and therefore all appointments she made between that date and June 17, 2019, when Andrew Saul became commissioner, are null and void. Doc. 6 at 15; Doc. 8 at 6-7. Defendant argues that the ALJ and Appeals Council had authority to decide this matter, Doc. 7 at 4-13, and that holding otherwise would "create the sort of administrative paralysis that Congress sought to avoid." Id. at 13.

The FVRA governs who has authority to serve as an acting official during a vacancy in a Senate-confirmed office. The FVRA provides three options for designating an acting official. First, the "first assistant" to the vacant office "shall perform[its] functions and duties." 5 U.S.C. § 3345(a)(1). Second, the President may designate another Senate-confirmed official to assume the acting duties. Id. § 3345(a)(2). And

---

could return to work as a public defender despite mild limitations in mental functioning due to anxiety).

third, the President may designate an officer or employee within the same agency to perform the acting duties, provided the individual satisfies the tenure and salary requirements of the statute.  Id. § 3345(a)(3).  An acting official serving under the FVRA may serve "for no longer than 210 days beginning on the date the vacancy occurs; or . . . once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate."  Id. § 3346(a)(1)-(2).[23]

On December 23, 2016, President Barack Obama issued a memorandum order establishing an order of succession for the Social Security Administration ("SSA") pursuant to the FVRA, 5 U.S.C. § 3345(a).  See Providing an Order of Succession Within the [SSA], 81 Fed. Reg. 96337 (Dec. 23, 2016) ("Succession Order").  Among other things, the Succession Order specified that if the Commissioner and Deputy Commissioner positions were both vacant, the Deputy Commissioner for Operations would serve as Acting Commissioner.  Id. § 1(a).

In January 2017 -- during the transition period between the terms of President Obama and President Donald Trump -- Deputy Commissioner Carolyn Colvin, who had been appointed and confirmed by the Senate, resigned as Acting Commissioner of the

---

[23]For vacancies that occur during the first 60 days after a Presidential transition, the 210-day period runs from the later of 90 days after inauguration or 90 days after the date of the vacancy.  5 U.S.C. § 3349a(b).  If a first nomination does not result in a confirmation, an acting official may serve for another 210 days, id. § 3346(b)(1), and during the pendency of a second nomination.  Id. § 3346(b)(2)(A).  If the second nomination also fails, the acting official may serve for another 210 days.  Id. § 3346(b)(2)(B).

SSA, leaving both the Commissioner and Acting Commissioner offices vacant.

Consistent with the Succession Order, Deputy Commissioner for Operations Nancy

Berryhill began serving as Acting Commissioner, and she continued in that capacity until

November 16, 2017, when the Government Accountability Office indicated that she was

in violation of the 210-day FVRA time restriction for acting officers.  See Dahle v.

Kijakazi, 62 F.4th 424 (8th Cir. 2023).[24]

President Trump nominated Andrew Saul to be Commissioner on April 12, 2018,

see Reddick v. Kijakazi, Civ. No. 21-1782, 2022 WL 16703903, at *13 (M.D. Pa. Oct. 7,

2022), R&R adopted, 2022 WL 16700395 (M.D. Pa. Nov. 3, 2022), at which time Nancy

Berryhill resumed her prior office as Acting Commissioner pursuant to section

3346(a)(2) -- the legitimacy of which is at issue here.  Acting Commissioner Berryhill

served in that capacity from April 12, 2018, until the Senate confirmed Mr. Saul as

Commissioner on June 4, 2019.  Id. § 3345(a)(2).[25]  During this period, on July 16, 2018,

Ms. Berryhill ratified the appointment of ALJs and Appeals Council judges.  See Social

Security Ruling ("SSR") 19-1p, "Titles II and XVI: Effect of the Decision in Lucia v.

---

[24]The 210-day period was extended by 90 days by virtue of section 3349a(b) because the vacancy existed during the 60-day period prior to inauguration.

[25]Mr. Saul remained Commissioner until President Joe Biden removed him on July 9, 2021, at which time Kilolo Kijakazi, as Deputy Commissioner, became Acting Commissioner.  See 42 U.S.C. § 902(b)(4) ("The Deputy Commissioner shall be Acting Commissioner . . . during the absence . . . of the Commissioner. . . ."); https://www.ssa.gov/agency/commissioner/ (last visited March 22, 2023).

Sec. & Exch. Comm'r (SEC) on Cases Pending at the Appeals Council, 2019 WL

1324866, at *2 (Mar. 15, 2019).[26]

Relying on a district court decision from Minnesota, Plaintiff argues that the above

chronology is flawed insofar as Ms. Berryhill was not statutorily authorized to serve as

Acting Commissioner for the second period of time commencing on April 12, 2018, and

that her subsequent ratification of the ALJs' and Appeals Council judges' appointments

was therefore a nullity.  Doc. 6 at 13-14 (citing Brian T.D. v. Kijakazi, 580 F. Supp.3d

615 (D. Minn. 2022)).  In Brian T.D., the court held that the ALJ who heard T.D.'s case

lacked authority to render a decision because Ms. Berryhill was not properly serving as

Acting Commissioner when she issued the July 16, 2018 Order ratifying the appointment

of ALJ and Appeals Council judges.  580 F. Supp.3d at 635-36.  The district court

reasoned that Ms. Berryhill did not resume her position as Acting Commissioner when

President Trump nominated Mr. Saul to be Commissioner (April 12, 2018) because the

FVRA does not include a "spring-back" provision, and therefore Ms. Berryhill was not

authorized to serve as Acting Commissioner beyond the 210-day limit, which had expired

prior to the nomination of Mr. Saul.  Id. at 633-34.

On March 7, 2023, after the parties submitted their briefs in this matter, the Eighth

Circuit reversed Brian T.D., finding that Ms. Berryhill was properly serving as Acting

Commissioner when she issued the ratification order, and therefore the ALJ had authority

---

[26]On June 21, 2018, the Supreme Court invalidated the appointment of SEC ALJs
because they were not appointed consistent with the Appointments Clause.  Lucia v.
SEC, 138 S. Ct. 2044 (2018).  Social Security Ruling 19-1p addressed the impact of
Lucia on social security cases.

to adjudicate the application for benefits.  See Dahle, 62 F.4th 424.  In doing so, the

Eighth Circuit -- the only circuit court to have addressed the issue at the time -- joined

numerous district courts which have uniformly (other than Brian T.D.) rejected the

argument that Acting Commissioner Berryhill was serving in violation of the FVRA

when she appointed ALJ and Appeals Council judges on July 16, 2018.  See, e.g., Ortiz

v. Comm'r of Soc. Sec., Civ. No. 21-5478, 2023 WL 2375580 (E.D.N.Y. Mar. 7, 2023);

Vanorden v. Comm'r of Soc. Sec., Civ. No. 21-19985, 2022 WL 17959586 (D.N.J. Dec.

27, 2022); Reddick, 2022 WL 16703903; Lance M. v. Kijakazi, Civ. No. 21-628, 2022

WL 3009122 (E.D. Va. July 13, 2022), R&R adopted, 2022 WL 3007588 (E.D. Va. July

28, 2022); Avalon v. Kijakazi, Civ. No. 21-2051, 2022 WL 1746976 (D. Nev. May 27,

2022).[27]  The conclusion reached by these myriad courts is consistent with principles of

statutory construction and the FVRA's legislative history, and also with the

commonsense need for the federal government to continue functioning, which underlies

the FVRA.

Proper statutory interpretation begins with the plain text of the statute.  Ross v.

Blake, 578 U.S. 632, 638 (2016); see also Idahoan Fresh v. Advantage Produce, Inc., 157

F.3d 197, 202 (3d Cir. 1998) ("The role of the courts in interpreting a statute is to give

effect to Congress's intent," and "it is presumed that Congress expresses its intent

---

[27]On April 11, 2023, the Fourth Circuit also determined that Ms. Berryhill was
properly serving as the Acting Commissioner while Mr. Saul's nomination was pending
in the Senate.  Rush v. Kijakazi, __ F.4th __, 2023 WL 2877081, at *3 (4th Cir. Apr. 11,
2023).

through the ordinary meaning of its language.") (citations omitted).  The text of section

3346 reads as follows:

> (a) Except in the case of a vacancy caused by sickness, the
> person serving as an acting officer as described under
> section 3345 may serve in the office –
> (1) for no longer than 210 days beginning on the date the
> vacancy occurs; or
> (2) subject to subsection (b) [dealing with a pending
> nomination to fill the position], once a first or second
> nomination for the office is submitted to the Senate,
> from the date of such nomination for the period that
> the nomination is pending in the Senate.

5 U.S.C. § 3346.  The word "or" between subsections (1) and (2) is the key term that

must be construed.  In Dahle, the Eighth Circuit interpreted the statutory language to

permit Ms. Berryhill to validly serve under both subsections (1) and (2).

> Subsections 1 and 2 operate independently, providing distinct
> limitations on when an individual who is qualified to serve
> under § 3345 may begin or end their service.  Subsection 1
> allows an individual to serve for 210 days after a vacancy
> occurs.  Subsection 2 allows an individual to serve from the
> time a nomination is sent to the Senate until that nomination
> is no longer pending.  Subsection 2 contains no time limit
> expressed in a number of days and speaks in no manner as to
> other requirements for a person to serve as an acting officer.
> Rather, it provides a time limit through reference to Senate
> action.  There is simply no textual basis to imply that
> subsection 1 and its 210-day limit somehow restrict a
> person's service under subsection 2.

Dahle, 62 F.4th at 427-28.  Thus, the term "or" does not preclude one who served under

subsection (1) from also serving under subsection (2).  Id. at 427.

This plain reading of the statute is supported by its legislative history.  The Senate

Government Affairs Committee report stated that an "acting officer may serve even if the

nomination is submitted after the 150 days has passed," S. Rep. No. 105-250, 1998 WL 404532, at *14 (July 15, 1998), and the only change between the proposed language discussed in the Senate Report and the enacted version of the FVRA was an increase in the number of days an individual could serve as an acting official, from 150 to 210 days. See Karen E. v. Kijakazi, Civ. No. 21-3015, 2022 WL 17548642, at *17-18 (N.D. Iowa Sept. 15, 2022).

Finally, if the FVRA were construed as Plaintiff suggests, an incoming President would be unable to name acting officers to numerous critical offices within the federal government because the 210-day service periods would lapse before the new President could submit nominations to the Senate.  Such an outcome would create a dysfunctional paralysis of government contrary to congressional intent.  See S. Rep. No. 105-250, 1998 WL 404532, at *18 (purpose of FVRA is to ensure that "[a]ll the normal functions of government could thus still be performed").

For the aforementioned reasons, pursuant to sections 3345 and 3346, Ms. Berryhill became Acting Commissioner for a second time on April 17, 2018, when Mr. Saul's nomination was presented to the Senate for confirmation, and she was properly serving as Acting Commissioner on July 16, 2018, when she ratified the appointments of the ALJ and Appeals Council judges.  Therefore, the ALJ and Appeals Council judges had proper authority to adjudicate Plaintiff's application for benefits.[28]

---

[28]In his reply brief, Plaintiff asks that even if Ms. Berryhill properly served as Acting Commissioner for two distinct periods of time (the first ending on November 16, 2017, and the second beginning on April 18, 2018), then "who was the Acting Commissioner of SSA between November 16, 2017 and April 17, 2018?"  Doc. 8 at 7.

## V.    <u>CONCLUSION</u>

The ALJ 's decision is supported by substantial evidence.  The ALJ properly considered the opinion evidence, relying on inconsistencies in the treatment providers' notes and inconsistencies with the record as a whole.  The ALJ adequately explained her reasoning for failing to include any limitations related to Plaintiff's non-severe mental impairments her RFC assessment and the hypothetical upon which she relied.

In addition, I reject Plaintiff's argument that former Acting Commissioner Berryhill lacked the authority under the FVRA to ratify the appointments of the ALJ and Appeals Council judges on June 16, 2018.

An appropriate Order follows.

---

The question is irrelevant for present purposes because, as explained above, Acting Commissioner Berryhill had proper authority to issue the July 16, 2018 Order ratifying the ALJ and Appeals Council judges by operation of statute.  5 U.S.C. § 3346(a)(2) (Acting Commissioner serves from time nomination is submitted to Senate until confirmation).